334-1202 Regents of the University of California, Dakocytomation Regents of the University of California, Dakocytomation Regents of the University of California, Dakocytomation Regents of the University of California, Dakocytomation American Society of Human Genetics, Far-Reaching and Revolutionary You know that doesn't help. That's true stuff. And we're focusing on the claims, right? And that's the principal issue in the second case. That was dispositive. That's true. It was. I guess I'm glad you're arguing the two cases together because I was a bit confused. I mean it seems to me on the first case, the PI, we're focusing on the morphologically term. If we were to, hypothetically, if we were to construe that term, as did the district court judge, why doesn't that also resolve the motion for summary judgment? I mean, suddenly a motion for summary judgment, we're arguing all about heterogeneous. But that other term appears in the patents. If we were to agree, hypothetically, with the district court judge, under construction of that term, does that dispose of both cases? It does not. It would actually resolve nothing. Because in our view, under either construction of morphologically identifying the cell nucleus, there are factual issues to be determined. But isn't it unique in both patents? No. It's only in the 479 patent, Your Honor. The 479 patent is in both cases. Oh, I'm sorry. Yes, it is. But that's true. One on the non-imprisonment question and the other on the preliminary injunction question. That's true. There's actually one exercise left. I agree with that, Your Honor. But I don't understand. You were saying just a minute ago, as opposed to the question, that there are, I understood you right, that there are factual issues in the construction of morphologically identifying, is that what you said? Yes, remember, that term was only construed at the preliminary injunction stage. But you can see it in infringement. That's how you got to deal out your PI. And given the construction, you can see that infringement, right? No, I don't think we did, Your Honor. There was no concession of infringement on morphologically identifiable cell nucleus under the district court's interpretation. In fact, I think the facts, as they turn out, is even when using DACA's method, a significant percentage of their cells, even a significant percentage of their cells, I think it's 14 to 20 percent, still would meet the definition, the narrow definition that the district court gave that term. So there would still be terms. There was no summary judgment ruling relating to the term morphologically identifiable cell nucleus. This was a PI issue only. The court never reached that term on summary judgment. In fact, there were expert affidavits flying back and forth on summary judgment on that issue, which is presumably why the district court did not reach that issue on summary judgment. So now with respect to the term heterogeneous mixture of labeled unique nucleic acid fragments, I mean, the issue is this. The district court held that the heterogeneous mixture was comprised only of unique sequences. It could not include repetitive sequences. But five dependent claims. But didn't you argue in response to a rejection that unique sequence nucleic acid fragments are in contrast with the three dependent sequence nucleic acid fragments? Your Honor, no. We did argue that. But that relates to a different issue. All that related to is defining what a unique fragment is. A unique fragment is a fragment which the defendants don't have because they have dependent sequences. That's not correct, Your Honor. Defendants have in their heterogeneous mixture, they have two components. One component is a heterogeneous mixture of unique fragments. Unique fragments that have different sizes and different base pairs. They also have repetitive sequences. So they have combinations of repetitive sequences and unique sequences in their heterogeneous mixture. The district court ruled that that wouldn't infringe because the term at issue here excludes any situation where you have both unique and repetitive sequences. That, of course, contradicts quite squarely five dependent claims. Yeah, but leaving that aside for a moment, you started off by talking about what a great invention this was and how monumental it is. And it seems to me, reading the spec, the summary of the invention, the abstract, that you've said the principal cause of nonspecific binding are repetitive base sequences. I mean, it reads as if what you've invented here allows you to get around those. It isn't finding sequences. Why am I wrong? Well, because there are situations where there's two ways to avoid the noise. I mean, here's what happened in the prior art. In the prior art, if you tried to look at a single cell nucleus and you saw a signal in that nucleus, you couldn't distinguish between the signal and the noise. Say you've got ten pieces, ten signals. You had no way from looking at a single cell to determine whether it was a single signal or noise. Now, we've come along, and for the first time ever, when you look at a signal in a single cell, you know it's a true signal. It's not a false positive. And that was really the monumental advance. How do we do that? Two ways. One is, in the prior art, the focus was on using homogeneous unique fragments that were all the same. Why? Because they figured if you only used one single unique fragment, you'd get less noise. If you used a bunch of different unique fragments, you'd get more noise. Well, we went the opposite direction of the art, and we decided to use a complex mixture of unique fragments, which increased the signal way up. But, to overcome the problem with increasing the noise, we talked about three countermeasures, two of which involved eliminating the repetitive sequences from the heterogeneous mix, but one of which, the blocking method, involved having the repetitive sequences in the mix, but blocking them. But the blocking method comes from a 841 patent. Those three methods were in the 841, right? They're in both patents. The patents share specs. They have the same specification. Well, I'm not sure the other side agrees with that. I guess we'll find out if they do or not. Let me ask you. You were the ones that added a unique sequence to the prosecution history. You were facing a 102 rejection and a 112 rejection, and it was unclear to me, particularly in your great briefs after we bumped with the red-leafed arguments of the prosecution history, what is your specific answer to why that term was included, but not excluded? It's this. The examiner raised three rejections to the then-existing claim, 112 rejections and prior art 102 rejections. The original claim, Your Honor, actually covered using labeled repetitive sequences to detect repetitive sequences. So in the prosecution, the examiner said, and he focused on two pieces of prior art, Landagen and Montgomery. This is it. Supplemental Appendix 6613. I urge you to read it. What the examiner said is, hey, these two pieces of prior art use labeled repetitive sequences to detect repetitive sequences, and your claim is broad enough to cover that. So in response, we amended our claim to talk about using a heterogeneous mixture of unique segments to detect unique sequences. And so we were just saying, listen, we're not covering detecting repetitive sequences. We're covering detecting unique sequences. And so that's why we did it. But that's not what the claim says. I mean, the claim as it comes out, then, having unique sequences, isn't limited in the way that you just described, is it? Well, no, it is, because now we say in the claim that we are detecting, we're using labeled unique fragments to detect unique sequences. And that distinguishes the prior art's use of labeled. Can you show me that in the claim language? Sure. 479, go to claim 1. That phrase, okay, so we're looking at, like, what, column 16? Column 16, right. 10, 9, 10, 11. So under A, you'll see providing a heterogeneous mixture of labeled unique sequence nucleic acid fragments. You see that? Right. And then if you go to about two lines down, you'll see for which detection is desired. You see that, for which detection is desired? Yeah. So all we were doing was distinguishing art that used labeled repetitive sequences to detect repetitive sequences. And we said, no, no, that's not our invention. Our invention is using labeled unique to detect unique. But in no circumstance did we say that that heterogeneous mixture excluded the possibility of having repetitive sequences in the mixture. Not only did we not say that, we came along and added claims, including claim 12, with states, wherein the heterogeneous mixture further comprises repetitive sequences. There's five dependent claims that require the inclusion of repetitive sequences. Yeah, but you know, but our cases, I mean, you know, unfortunately for you, that's not a dispositive necessarily. We do not agree with respect to our case law. I mean, our case law, we talked about we're not going to let the dependent claim tail wag the independent claim dog, the dog, and that sort of thing. So I understand your point, but it's not really dispositive in terms of our case law. I actually think it might be dispositive. And if it's not dispositive, it's a super, super, super presumption. Here's why. This is not a traditional claim differentiation issue. Traditionally, what you're looking at is a situation where you have an independent claim, and you're asking yourselves whether a dependent limitation should be implicitly incorporated into the independent claim. In that circumstance, say that happens, the stress dependent limitation becomes redundant, superfluous. But at least the independent claim and the dependent claim are consistent with one another. When was Claim 1 amended in relation to the introduction of Claim 12, which probably was an original claim? October of 1995 is, I believe, when we amended the claim and put the unique circumstances. And about a year later, we added the dependent claims, which made it crystal clear that the mixture could include repetitive sequences. And when did you do the disclaimer? When was the terminal disclaimer? The terminal disclaimer was right about that time. I think it was about a year or so later. But remember here, that's why this is not a traditional case. We have found no case, Dan said it, no case where this court has ever endorsed construing an independent claim in a way that contradicts an express limitation in a dependent claim. Well, let's hope this isn't the one. Can I take you back now to the play between these two cases? Let's assume hypothetically that, and I also have said it before, I didn't get a clear answer. Let's assume that we would agree with you on the heterogeneous mixture, but agree with the district court on her construction of morphologically localized. Where does that leave us in this case? It gets remanded back down to the district court with a new construction of morphologically identifiable cell nucleus, or your construction. And then you say there's still a dispute on the infringement question. Are there pending counterclaims of invalidity on the heterogeneous issues? I think there's pending counterclaims of invalidity on the claims in both patents. I think that's true, yes. Doesn't morphologically relate to shape? I would agree with that. I mean, the dictionary definition of a morph, let's turn to the morphologically identifiable cell nucleus issue. But just one last closing point on the heterogeneous mixture before I do, if I can test your patience here. Didn't he mean you want to engage in a repetitive sequence? Exactly. Your Honor, here's one thing to keep in mind. The district court said we disclaimed heterogeneous mixtures with repetitive sequences. But remember, the patent office disagrees with that. This is a situation where the patent office focused on the dependent claims. Here's what the examiner said. The proposed amendment to add claims includes limitations directed to disabling repetitive sequences via the blocking nucleic acid method. So the examiner absolutely positively recognized we did not disclaim what the district court found that we disclaimed. So this should not be the first time in history on this record to hold that an independent claim can be construed to exclude what a dependent claim requires. To your question, Your Honor, thank you for your patience. The dictionary definition of morphological is biological organism's structure and form. That's what it is. And that's what we're construing the term morphologically identifiable. Structure in which? It's a biological organism's structure and form. Structure and form. Yeah, that's the dictionary. You can pull it up on the Internet. We are construing the term morphologically identifiable cell nucleus according to its ordinary meaning. Identifiable, recognizable. That's all. The district court has held that in order to be a morphologically identifiable cell nucleus, it has to have a full set of chromosomal DNA. A lot of things wrong with that, but the first thing and the most obvious thing that's wrong with that is it's absolutely and cannot be true. Why? Under normal conditions, when you look at a cell and you're trying to identify with a microscope what amounts to a cell nucleus, when that cell is in interphase, you can't see the DNA. You cannot possibly see it. So in other words, it has the same morphological shape it can, irrespective of the particular DNA in there. That's exactly what I'm trying. It helps you not one way to recognize or identify a cell nucleus by focusing on whether it has a full set of chromosomal DNA or not, because you can't see it. And DACA agrees with this. Now, you remember, with their method, they use a slicing method. They slice the cells. So they say, for most of their cells, and we don't say, oh, we disagree with all of them, but for most of their cells, they lose chromosomal DNA. Now, nevertheless, in their product instructions, what they tell people when they're looking for signal within their cells, they say, count the cells where nuclear morphology must be intact when evaluated. Nuclear morphology must be intact when evaluated. And disregard cells with poor nuclear morphology. So what they're saying is, regardless of whether you can see the chromosomal DNA or not, and you can't, they're recognizing that the cells in their system are, in fact, morphologically identifiable cell nucleus. And this is completely consistent with the patent record. Here's what the examiner said. If we disagree with you on the summary judgment of non-accreditment and affirm, is 1334's denial of a preliminary injunction moot, aside from, perhaps, claim construction issues? It's not moot, because there's no final judgment, and therefore, the PI remains a live issue. But I think, Your Honor, the proper way to proceed here is the district court will not move as far as the PI is concerned. Oh, I'm sorry, I'm sorry. So the case continues. Would the case continue? And there are patent construction issues. If you affirm the summary judgment of non-infringement on both patents, I believe the answer would be that that would move the PI. I take that back. Yeah, I take that back. They have multiple products. Only two of the products have been finally adjudicated on summary judgment. Twenty other products have not, so it would not move the PI, Your Honor. Not too out of track, this. I'm sorry? Not too out of track, this case. Well, right now, it's easy. Two claim construction issues and a FASTO issue. That's what we really are here to get a resolution on. Now, in addition to the plain meaning of morphologically recognizable identifiable cell nucleus favoring us, look at the patent. It's completely consistent. What the examiner said when talking about this very term is identifiable cell nuclei are identified by observation of a nuclear membrane in a sample. That's what we say. Nothing about chromosomal DNA and being able to observe it. We also said during prosecution that we wanted to target DNA in some natural biological structure, but we said this structure may be partially destroyed to allow good hybridization. So it doesn't have to be a fully intact cell. We go on to say in our specification that when you treat the cells, ensure there's no unacceptable loss of morphological detail. So throughout, the patent record recognizes you don't have to have a fully intact cell. But here's what's really, really dispositive. Column 10, lines 30 to 31 of 479 of the patent has a section entitled constituent hybridization. And it says this in talking about the methods that are contemplated by this patent. It says, several excellent guides to the technique are available. Where are you? Column 10, what line are you saying? Column 10, line 30. Several excellent guides to the technique are available. And then we cite two articles, Gall and Pardue, and we also cite Angerer. A-N-G-E-R, it's spelled line 37. Angerer is all about tissue sectioning, exactly what DACO does. It's talking about cell slicing, where you're clearly going to lose chromosomal DNA for a large percentage of the cells. Here's what Angerer says on page 47 of its article. By the way, this article is incorporated by reference into the specification, so it's as if it's set forth fully. Here's what the article says, and it's talking about tissue sectioning. Sections are usually cut 5 to 10 microns thick. That's what DACO does. In our experience, paraffin embedding provides relatively good morphology. Relatively good morphology. I appreciate that. I didn't know that. Four minutes to get to 25. Okay. Moreover, there's another reference, too, that we cite. We talk about these in our brief, the Bagrati article. It also talks about slicing cells 5 microns where you're going to lose some chromosomal DNA, and what it says is that these are conditions where significant morphological detail is retained. So the patent record is completely consistent with what your gut tells you about the plain meaning of morphologically identifying a cell nucleus. We didn't say morphologically intact cell nucleus. We said identifiable, recognizable. And DACO's own literature recognizes that its cell nuclei are recognizable. Now, when you're talking about this morphologically identifiable, in the very early part of the argument about fact matters, the fact is still the issue. Is that an infringement of that, or is that in the construction of the charge? Well, clearly the construction of the term remains in dispute. Yeah, but that is a factual matter, right? There is actually a factual dispute as well, because at the PI stage, we lost in the district court all of it. Well, but the court, this court, has said it's a fact. There's no factual matters involved with fact construction. Purely a legal matter. You're absolutely right, Your Honor. And I understand not completely what you're saying. So what are you saying? All I'm saying is— What are you concerned about, us not reaching this, because of the factual matter? What is it that's concerning you? Well, Judge Prost asked, would the whole case be over if this court agreed with the district judge's legal interpretation of morphologically identifiable cell nucleus? And I said the answer is no, the case wouldn't be over, because there would remain factual issues to resolve down below, not for this court. If you agree with my interpretation of morphologically identifiable cell nucleus, there is no longer any issue at all on infringement with respect to that. We took this case on a certified issue. It wasn't a final judgment. True, right? And that's why it would be remanded once the claim construction issue is resolved. Final professor issue. Let me take a couple of minutes into my rebuttal. Here's the issue. There's no literal infringement of the 841 patent, because we require— Your Honor, would you mind telling me my time so I can plan properly? You've got a minute and a half. You're 25. Thank you. We know your argument. It states that it wasn't that nucleic acid was the issue, but the blocking aspect. And that's really the issue. There's no literal infringement, not because of the blocking aspect of any of this. Remember, there's no dispute at all that DOCO uses the same blocking method that our patent sites. They just replace DNA with PNA. That's all they do. So, look, two things. One is, the FASTO presumption is supposed to be looked at on a limitation-by-limitation basis. So that means you should be focusing on whether the limitation at issue was narrowed. Here, there's no dispute that they used the blocking method. The only dispute is whether PNA is equivalent to DNA. We say it is. It's like nucleic acid wasn't narrowed.  It was in there from the beginning. Every plant, from the beginning of time, had nucleic acid in it. And we never narrowed it. We could have, for instance. We could have used the term blocking component and narrowed it to nucleic acid. But we never ever did that. So we never narrowed nucleic acid. And because we never narrowed nucleic acid, there is no FASTO presumption to overcome. The second issue on tangentiality, just very briefly. The reality here is, there was never any issue in the prosecution history which remotely signaled to anyone and put on anyone's radar screen that we were dealing with the distinction between natural DNA and synthetic DNA. It just never happened. The only issue before the examiner at the time was distinguishing prior art methods of selection, unique fragment-only mixtures, versus blocking. There was never any issue about what you blocked with. So it's a completely different aspect of the invention. That is an issue here with respect to equivalence. And I'll reserve the remainder of my time for the above. I did under the desk too. Over here? Yeah. Okay. Still says zero. Okay. Sorry. I can do it the old-fashioned way. I don't usually ask this question. May it please the Court. Let me begin by correcting one statement that my adversary made during his argument. And that question was asked, if the summary judgment is affirmed, would that move to PI? And the answer is it would move to PI. It is true that there are a couple of or several minor products that were not encompassed by the summary judgment as it related to the 841 patent. But those products were not an issue in the PI. There was only one product that was an issue in the PI. The HER2 product. Move to PI as far as it goes. Yes. Yes. The PI was only directed to the HER2 product. And the summary judgment rulings found no infringement with respect to the HER2 product, both as to the 417 patent and as to the 841 patent. But on the other question, if we were to affirm the PI in the claim construction of morphological identifiable cell nucleus, let me first on the heterogeneous construction of the cell nucleus. That leaves us with probably the Court having to address our motion for summary judgment on morphologically identifiable cell nucleus. We didn't. The District Court. The District Court. We did raise that as a basis for our summary judgment motion. That claim language does appear in both patents. The Court did not reach that issue. Okay. And that there's some player of this question with respect to the infringement aspect of that, so that we couldn't just focus. Yes. The appellants did argue that there were disputed issues back there. We don't agree that there are, but they certainly were raised below. Tell us why unique sequence is not tantamount to free of repetitive sequence nucleic acids. Why it's free of? Well, your opponent says it doesn't exclude. Well, it excludes them, Your Honor, because when that claim language was added, it's extremely important to look at the context in which that claim language was added. The claim at that point in time just claimed a heterogeneous mixture of labeled nucleic acid atoms, and it did not have any limitation to block. And the examiner properly pointed out that that claim, as written, had no procedure, no structure, no composition to disable the repetitive sequences. And so they added the unique sequence to overcome that enablement rejection. And the only way that that would deal with the repetitive sequence problem is if unique means only unique. It means no repetitive sequences. The invention here really is directed to the problem of if you have a DNA probe that you want to bind to a target, how do you make sure that it just binds to the target and not to all the other DNA, which has all the repetitive sequence? Yeah, but there's three methods, and your prevailing on this is dependent on our construing the 479 patent to only deal with two of the three methods, correct? Correct. And, I mean, it's difficult. Because of the dependent claim? It's because, I mean, one of the dependent claims, and I think one thing I wanted you to respond to is your colleague's reference to this need not being your typical claim differentiation case, that here, and I mean, I kind of, I see what you say, and I want to know if you disagree, that here, it's not just a matter of differentiation. Here, to construe the patent otherwise, to construe the independent claim to just consist of unique sequences would completely vitiate the dependent claim. It would completely vitiate the claim. Is there a case that you know of that came from our court where we've allowed that to happen? I can't say that there's a case that has addressed that in so many words. But in many claim differentiation cases, what you are effectively doing is reading out claim language and saying that claim really doesn't matter. Or when you have any type of disclaimer case, you can have clear claim language. And then during the course of the prosecution history, you can disclaim subject matter. So this case is no different than those types of cases where something that appears to be claimed, in fact, is not because it's been disclaimed during the course of the prosecution. This claim... Claim 12 was added after Claim 1 was amended. Two and a half years after Claim 1 was amended. Claim 1, as I said, as you pointed out, there are three methods claimed here of getting rid of the repetitive sequences. Two of them really remove the repetitive sequences from the probe mixture. One of them deals with blocking. And so I look at those really as two different methods. One of them is to get rid of the repetitive sequences. The other is to block the repetitive sequences. The 841 patent deals with blocking. The 479 patent, the patent with the heterogeneous mixture of labeled unique sequences, gets rid of the repetitive sequences. Either by the way you make them or actually pulling them out of the mixture once you make the mixture. But you have a probe mixture of just unique sequences. No repetitive sequences. So it then won't bind to everything else. You don't need to block it. But if you don't have that, if you don't have a unique mixture, then you're going to get nonspecific binding. And you're not going to achieve the objects of the invention. That's what the invention is all about. But one, there's a terminal disclaimer having been applied. There was a terminal disclaimer. They have the same specification. They do have the same specification. But here as you describe it, the two are entirely different. One does one thing and the other does the other thing. That's correct, Your Honor. And that's how we read it. I mean the one application, the blocking nucleic acid patent issued, and then at that point a divisional application was filed. Are you saying one application discloses two inventions, but the claims separate them? Yes, the claims separate them. It was a divisional case, not by virtue of a restriction requirement by the examiner, but simply by virtue of the applicant deciding that they were going to claim the blocking method in one patent, and then they were going to claim the other method of disabling the repetitive sequences in the other patent. And that is to use a mixture of unique sequences. As I said, if you don't get the repetitive sequences out of the mix and you don't have blocking, it won't work. And the examiner recognized that, issued the enablement rejection. They came back then and amended the claim and said, okay, we put in unique sequences, and that was the way they overcame the enablement rejection. The examiner came back later and said, well, I've got a problem with unique sequences. I don't know exactly what it means. It's indefinite. And then at that point they came back and they said, unique means free of repetitive sequences. And then they referred, when they said that, they cited back to the specification, and they cited to the part of the specification which said that preferably the heterogeneous mixture is substantially free of repetitive sequences. Does morphological relate to shape or having the same complement of DNA? We think it relates to not just shape but also having an intact nucleus in the sense that you have all the chromosomal DNA. So you're saying both? Yes. But it has to, if you look at the prosecution history and some of the statements that were made, in connection with this terminology, they argued that the target DNA is in some biological structure and the features of the structure relevant to the desired measurement are not destroyed. And in our case, we sliced the, it was a paraffin-embedded tissue sample, sliced it to get a very thin sample, and then when you look at it after you've stained it, you don't know what you've got there. If you're looking through the microscope, you can't tell whether you're looking at a partial cell or a whole cell. I mean, almost all of them are partial cells. So if it looks the same, you're concluding, the invention concludes it is the same. Is that right? Morphologically identical. But the invention is about being able to... About the nucleic acid sequence. Well, with respect to the morphologically identifiable, the invention is about being able to look at a cell and being able to determine whether or not you have extra chromosomes or a missing chromosome or some other defect. And you can only do that if you have an intact cell. To be able to do this in situ... At the same time, you used the wrong word. I'm not sure which word you're referring to. It depends upon what's inside the cell rather than its external appearance. In our view, it depends on both. Morphologically means you have to have a cell that includes the chromosome inside. Now, they do talk about, mention the fact that the patent talks about some loss of structure. But the kinds of loss of structure that we think they're talking about in the specification is simply some damage to the membrane. Certainly, they're not talking about loss of structure as far as removing chromosomal DNA. The only way you can evaluate a cell where you have a loss of chromosomal DNA is to use multiple probes and then to look at a large section of cells and then count how many probes you have in a certain area and do a ratio of the ones that are binding to the target sequence and the ones that are binding to another sequence and then see if you've got amplification. But you can't do it on a cell-by-cell basis, which is what they argued during the course of their prosecution, that their method would allow them to do. Additional questions? I would say you're morphologically different from your opponent, but that you have probably 99.99% the same DNA. I hope it's at least that much. If there are not any additional questions, then we'll rely on a break. Just a couple of points. One on the heterogeneous mixture and whether or not there was a clear, unmistakable disclaimer during prosecution. Counsel talked about the exchange that occurred in October of 1995, where there were these three rejections, these three amendments to the claims, and there was no discussion of matching them one to another. We have a reasonable interpretation of that exchange, and therefore that alone should say there's no clear and unmistakable disclaimer. But more importantly, you have to look at the entire patent record as it exists, when the claims are issued, which would include the examiner's summary where he recognized that, given our dependent claims, the heterogeneous mixture could, in fact, include repetitive sequences. Let me ask you about that. Is it clear to you that a clear and unmistakable disavowal is necessary? Assume for a second that we've got clear claim language that says unique sequences. Assume we don't buy your interpretation of the word of. You've got clear independent claim language saying unique sequences. Why does there have to be an express disavowal in the prosecution history, given what the claim says? Well, I think if you actually look at the claims as a whole, including how the dependent claims help you analyze Claim 1, I don't know how the plain language of the claims could mean anything other than what I say it means because we use the word of in Claim 1 interchangeably with comprises in Claim 12. They mean the same thing in the context of these claims, so the plain language plainly allows for repetitive sequences, which is why the other side is relying on what they termed a clear and unmistakable disclaimer, an argument that can't be reconciled with the fact that Pat and I was plain in recognizing that we could, in fact, have repetitive sequences in our heterogeneous mixture. Last final point on the morphologically identifiable cell nucleus. Yet the notion that losing some chromosomal DNA somehow takes the cells outside the scope of our claims can't be reconciled with the following. Even when you work with whole cells, okay, you're not slicing them up like Dr. Dux, you're still going to lose chromosomal DNA. Why? You have to open the cell to get access to it for hybridization. You've got to take proteins out. It's in the record, SA9650, slide 15. No matter what method you use, you're going to lose some chromosomal DNA. So that interpretation of the claims requiring a full set of chromosomal DNA really can't be reconciled with reality. If there are no further questions, that's all I have. Thank you, Your Honor. Thank you very much. All rise.